The next argument is in Appeal 1023 from 2009, Amgen v. Ariad Pharmaceuticals. Mr. Chesler, it's been a while since we've seen you here, at least on panels to which I've been assigned. Welcome back. Thank you, Your Honor. Please proceed. Thank you. May it please the Court, the District Court committed several errors in its claim construction, which in turn caused the District Court to enter summary judgment of non-infringement. And I'd like to address two errors in my time, and I'd like to reserve three minutes if I may, Your Honor. As I'm sure the Court is aware, this is a patent that deals with the regulation of a transcription factor known as NF-kappa-B. Counsel, why do I draw a line between antibiotics and Enbrel and Kineret? I'm sorry, Your Honor. Why do I draw the line between antibiotics and Enbrel and Kineret? That's what you want. You want antibiotics on one side of the line, and antibiotics, I understand, is extracellular impact to reduce NF-kappa-B. And then you want Enbrel and Kineret, which Enbrel is extracellular and Kineret is on the surface of the cell, but you want those. It's a weird line, and I don't know where the support in the specification comes for that line. Well, Your Honor, I believe it comes from several places. One, there is throughout the patent, and I can give you some examples, a difference between treatment and prophylaxis. And what we're talking about here is a signaling pathway. Well, but antibiotics are treating. They're not prophylactic. Antibiotics kill bacteria, which therefore inhibit the production of TNF, prevents the TNF from going through the receptor. I've done my homework here, and thereby reduces NF-kappa-B. It's not prophylactic. It's not taking the tactic of preventing the increase of NF-kappa-B, but rather actually reducing NF-kappa-B. So prophylactic doesn't at all answer my question. Your Honor, it has the effect of reducing NF-kappa-B activity by doing something that is far removed from the signaling pathway that is the entire invention here. If I may use an analogy. If we were talking about reducing the light in this room, as opposed to reducing NF-kappa-B activity in the cell, we could turn off the light switch. That would be intracellular. We could go down to the basement of the courthouse and turn off the circuit breaker that feeds the power to this room. That would be extracellular, and it would be part of the signaling pathway. We could blow up the power plant outside the district that supplies the power to this whole part of the district. That would also be extracellular, but that would be analogous to what an antibiotic does. It's not, in fact, affecting the closed circuit, if you will, of the signaling pathway. But why do you want the circuit, which I don't understand, to include the TNF? Because antibiotic kills bacteria, stops the production of TNF. Embryol attaches itself like Pac-Man to the TNF and prevents it from then lodging in the receptor and thereby reducing NF-kappa-B. All these things happen way over here, and the cell is here. Your Honor, if you include, what I'm trying to say to you is, as a matter of pure logic, there are things even before an antibiotic. For example... The sun. You mean the sun. Well, the sun. Umbrellas was an example. Don't go into a room with someone who has an infection so you won't catch it. The patent is not talking about anything that happens outside of a cell that affects activity. The patent is talking about only stuff that happens inside of a cell. Respectfully... You got it exactly right. The patent is not talking about anything outside of a cell. Your Honor, respectfully... And Embryol and Kineret aren't outside of the cell, are they? Your Honor... As a technological point, are they outside of the cell? Let him answer the question. Your Honor, they are outside the cell, but respectfully, the patent is not limited to only what is inside the cell, and that's where the district court made its mistake. If I may start with just a few points about why that's wrong as a matter of law. I'm a lot more confident about my grammar than I am about my organic chemistry, because I was once an English teacher, and I would submit to Your Honor, and I don't think we can honestly have a fight about this. If we do, you'll be wrong and I'll be right. A prepositional phrase modifies the term closest to the phrase. It doesn't modify a phrase back earlier in the sentence. If I said to Your Honor, I was dancing, and I heard music in the living room, and Your Honor said to me, that sentence means I was dancing in the living room, respectfully, Your Honor would be wrong. And if you look at claim – But counsel, hold on a second. But if that's right, then you're saying the in the cell doesn't modify where this activity – Exactly. Where this part takes place. Precisely. But then what gives you the line – you know what? If you had come in here today and argued to me there is no line, there is no limitation in this claim that carves out a line anywhere, I probably might agree with you. But you want a weirdly shaped line that excludes antibiotics, but encaptures the infringing devices. And I don't understand, which limitation then in the claim are you relying on for excluding antibiotics and saying it's everything in the cell and on top of the cell, but not beyond that? Your Honor, if I may, can I point you to one thing for example? Sure. If you look at column 3 of the specification, lines 59 to 62, it says it's now possible to alter or modify the activity of NF-kappa-B as an intracellular messenger. And as a result, to alter or modify the effect of a variety of external influences referred to as inducing substances. An antibiotic is not an inducing substance. Kineret is. Enbro is. They are something that is affecting the cell's surface, which is creating a signaling pathway that ultimately ends up with the expression of the gene and the production of the protein. Which limitation in the claim are you relying on for this limitation? You say it exists in the spec, and maybe I'll say it does too, but which limitation in the claim makes that a claim limitation as opposed to simply a discussion in the spec? Let me turn to claim 6. A method for diminishing induced NF-kappa-B mediated intracellular signaling. There's nothing about an antibiotic that induces NF-kappa-B mediated intracellular signaling. There is everything about extracellular chemical agents that affect receptors on the surface that induce such signaling. It goes on to say comprising reducing NF-kappa-B activity in cells such that NF-kappa-B mediated intracellular signaling is diminished. The use of the antibiotic, Your Honor, doesn't have anything to do with the NF-kappa-B intracellular signaling. What has to do with the intracellular signaling is the chemical agent that stimulates the receptor on the surface that creates the decoupling of NF-kappa-B from I-kappa-B within the cytoplasm that causes the process to move to the nucleus where the expression of the gene takes place, which in turn results in the production of the protein and the production of the protein out of the cell wall. It is a circle, and antibiotics have nothing to do with that circle, Your Honor, just as shutting down the power plant five miles away could turn off the lights in this room, but it has nothing to do with the circulation of electricity in this building, which I could affect by turning off the light switch or turning off the circuit breaker. Okay, I think I understand what you're saying, so tell me how Enbrel does. I certainly understand how decoy molecules do, how the inhibitors in the patent do, exactly what you're describing here. Your argument says to those I get, but how does Enbrel do what you're describing here? I believe, Your Honor, Enbrel has the effect of preventing the interaction of TNF-alpha with the receptor for TNF-alpha on the surface. It's just like flipping the switch of the circuit breaker. It prevents the electricity from getting to this room, so the room goes dark, and whether I turn the light switch off here or turn the circuit breaker downstairs is a distinction without a difference. It's within the cycle within this building, within the signaling pathway, if you will. So Enbrel prevents the TNF-alpha. Wait, why does it have to be within this building? What is it about claim six that says it has to be within some parameter? The intracellular signaling, Your Honor, is part of a pathway that is described, and that pathway has to do with starting outside the cell, but not 500 miles away from the cell, having to do with the inhibition of a chemical agent. I read, Your Honor, from the specification where it talks about chemical agents inducing agents that can be inhibited. And, Your Honor, the patent also says, if I may. Can I ask you to look at something else here for a moment, because I don't want you to run out of time before you have a chance to assuage my concern. In the course of this re-exam, there's a statement which seems to me comes close to a disclaimer. This is at 1095 to 1096. The two types of methods, the A method and the B method, and you said that it's directed only to the A method. So that's a disclaimer of the B method. So why doesn't the B method cover the accused product here? Two reasons, Your Honor. First, the B method talks about preventing external inducing stimuli. It means never having an induction, so that the cell is quiescent, so that there is no induced NF-kappa B activity to diminish or reduce. That's not the case we're talking about here. That's what's being distinguished in that statement. And also, Your Honor, in Part A of that statement, it says including particularly. Again, I hate to keep going to grammar, but we are talking about English language here. The grammar does nothing for me. I'm sorry. But including, Your Honor, doesn't mean that it means including but not limited to. It does not mean it does not include the situation in which is an extracellular stimulus. So A does not exclude what we're talking about here, and B is talking about a situation where there has never been a prior induction of the activity. It could have been worded more clearly, but it is not a disclaimer as Amgen claims it is. It disclaims the instance where there was no prior induction whatsoever, and that's exactly not the situation that involves Enbrel. Enbrel treats arthritis where there has been an induction of NF-kappa B activity, and the induction is diminished or reduced by blocking the hitting of the receptor on the cell surface. So it's not at all a disclaimer of what is involved in this case. If I could turn to just a few other points with respect to the inside-outside issue, if I may. Beyond the grammar and the common usage of, for example, cooling the temperature in a bottle of water by either putting ice in the bottle or putting the bottle in ice, either one would cause a cooling of the temperature inside the bottle of water, and in the absence of a specific limitation that says it can only be by doing something inside the bottle, the claim would apply to something that's being done outside the bottle. And for the reasons I've just tried to describe, this claim does not limit itself, in fact, to only things that are inside the bottle. Beyond that, I'd ask the Court to look at the District Court's own claim construction opinion. Amgen's principal argument here for limiting the claim to inside the cell is that they say in-cells and intracellular signaling are redundant, and therefore in-cells must be modifying the reduction, where the reduction takes place, and not where the level of activity declines. That's their entire argument. And I would ask the Court to look at the District Court's own claim interpretation, in which the District Court defined the term cells, and the District Court said cells here means intact cells, as opposed to cell extracts. So it's not at all redundant for the claim to say that there is a reduction in cells, because it's saying as opposed to cell extracts, and the specification, in fact, cites examples of NF-kappa-B activity in cell extracts. So their entire argument for limiting this to in-cells is based upon a fallacy. There is no such limitation here. Remind me again, I think you were telling me earlier, where is this pathway that you say I should interpret the NF-kappa-B mediated intracellular signaling to create? I mean, throughout the spec it talks inside-outside, but I just don't get this pathway out of the spec, and maybe you can help me. Well, Your Honor, again, it is in part described in claim, in column 3, or at the bottom of the claim, where it talks about modifying the effect of a variety of external... Hold on, let me get there, please. Sorry. Column 3, in what line? 59 to 62, I believe, Your Honor. Okay. Where it talks about modifying the effect of a variety of external influences referred to as inducing substances. Those inducing substances are the first step in the pathway. Okay. Is there, just so that I'm not missing something, I mean, it's a very long patent, but is the word pathway in here anywhere that I've just somehow missed? I do not believe so, Your Honor. I don't understand it. It just seems like you're creating a pathway, but I don't understand where it comes from. I mean, I just... Well, Your Honor... Before I gave you the luxury of saying, assume I agree with you, the spec says a pathway, then what? But now I want to go back on that because... Sure. I don't see where the pathway is, and I need you to... Well, Your Honor, what I suggest because of the time is if you would look at pages 15 to 16 of our opening brief with a series of citations in footnotes on the bottom of page 16, I believe that's where each of the steps that we talk about are described, just in the interest of time. Before you sit down, I want to come back to this example again. The antigen product allegedly performs the methods here in these claims, and it doesn't do it by preventing the inducement? It does it by diminishing the prior induction of NF-kappa-B activity. The reason someone is suffering from arthritis is because NF-kappa-B activity has been induced. I thought you were saying that it interfered with the signal pathway. It does. So why isn't that a situation whereby interfering with the signal pathway is preventing the inducement of this activity by the NF-kappa-B? It is, Your Honor, but only after it has been induced. In other words, it is terminating the prior induction, and thereby lowering the level of NF-kappa-B activity in the cells and having an ameliorative effect. But there has to have been a prior induction before the level is diminished or reduced. The words of the claim are quite clear, and 18 says the same thing. It's diminishing induced NF-kappa-B activity, and I would respectfully submit, Your Honor, you can't diminish something that doesn't exist. So there was a prior induction, hence creating the medical problem for the patient. So it's like it's preventing a second induction? It's preventing a continuous cycle of induction. Well, that sounds as though it's preventing induction. It's not, Your Honor, because there are cells that are, and they're described in the patent as quiescent cells, in which there's never been an induction. No one would take Enbril if they had quiescent cells, and in fact these claims wouldn't read on it. But counsel, aren't bacteria a prior induction? I mean, I don't know about you, but in this day and age, I don't give my kids antibiotics unless they've got a pretty severe bacterial infection already. My kids are too old for me to tell them what to do. But medical providers are quite clear that the overuse of antibiotics prophylactically are a very negative thing. So you only use an antibiotic once somebody has a detected bacteria. Wouldn't a bacteria already have induced NF-kappa-B activity? Yes, Your Honor, but that comes back to the point we were on before. The antibiotic is not, in fact, inhibiting these inducing agents that are specifically referred to in the patent. Well, the bacteria is an inducing agent, and the antibiotic is inhibiting the inducer. It's not, Your Honor. A bacteria is a substance which in turn affects an inducing agent, which in turn induces within the cell. It's again my example. I hate to oversimplify this, but it's my example. You're worried I'm using dominoes, and you think the inducer has to be the first guy. That's not a bad, and this patent doesn't cover dominoes. It covers, I've read now several times, it covers inhibiting. That's probably a good thing. Maybe. It covers inhibiting inducing agents. It doesn't mean by doing anything, including keeping your children home so they don't catch the infection from the child in the next seat. That sounds like Category B. If there had never been a prior induction, Your Honor, so this was entirely prophylaxis, which is what Category B is, it would be Category B. But you then would not have arthritis. There has to be a prior induction, which is ameliorated by interfering with the pathway. Ameliorated by preventing further induction. Further. Exactly. Further is the key point. That's got a problem with B. Your Honor, respectfully, it's not. Because, as I say again, if that were the issue, if that were true, then we would be talking about quiescent cells, that is, cells where there is no NF-kappa B activity whatsoever. And I would submit to Your Honor, you can't make any sense out of a claim that says, I'm going to diminish induced NF-kappa B activity, which is what the claim says. Those are the words. If there is no NF-kappa B activity to diminish. And in a quiescent cell, there is no NF-kappa B activity. But the way B is described, it's not limited to situations in which there is already NF-kappa B activity. Well, if I may just go back to B for one moment. Where there is an absence of NF-kappa B activity. B broadly talks about preventing inducement. It doesn't say preventing inducement in situations where there is no NF-kappa B activity, right? It says preventing the external inducing stimuli from inducing. Right. But it's not saying, as I understand it, you could have a situation in which there was already induced activity and that the Amgen product prevents further inducement. And I don't understand why that wouldn't be accurately described by Category B. Well, I would submit, Your Honor, if that's what we intended to say, we would have said preventing further inducement. We didn't say that. The absence of the word further. Yes, Your Honor. Because, as I said, there are two classes of cells. Okay. I understand. Thank you. Thank you, Mr. Powell. I'm sorry, Your Honor. I think I ran over my time. We'll give you some rebuttal. Thank you. There is no way to draw a line in these claims that excludes antibiotics, encompasses Enbrel, and does what Ariane is trying to do. The only boundary in these claims, the limit in these claims, is provided by the term in cells, which the district court properly construed and properly interpreted. And Judge Dike, you're right. It is B. It's preventing induction at most. Assuming an effect on NF-kappa B, it's preventing an induction. As we indicated in our red brief, their expert in the reexamination, Dr. Verma, has explicitly said it's preventing induction and it's preventing further induction that are excluded, that aren't encompassed by these claims. We discussed that in the red brief at pages 20 to 21. They can't distinguish that. They came back in their gray brief, and on page 21, they say, quote, antibiotics do not interfere with any step of the NF-kappa B signaling pathway. They kill bacteria. The secretion of NF-kappa B activating agents occurs prior to that pathway's first step, the binding of the agent to an extracellular receptor, end quote. That's why they say antibiotics don't apply. Enbrel binds TNF-alpha before TNF-alpha binds to an extracellular receptor. If an extracellular receptor binds TNF-alpha, Enbrel can't pull it off. All Enbrel does, assuming an effect on NF-kappa B, and that's an assumption for purposes of this discussion, is it binds TNF-alpha before binding to the extracellular receptor, at most, preventing further induction. And antibiotics are given to sick people. They're given to sick people who are already infected with bacteria that are already producing LPS, which under their model is already inducing NF-kappa B activity. It's not a prophylactic treatment of antibiotics, and there's no way to draw a line that says, oh, antibiotics are just before there's LPS. You're getting rid of the bacteria, thereby getting rid of the LPS. You're not actually getting rid of the LPS. That's not in the claims. That's not in the patent. None of these lines are in the patent, Your Honors. Those aren't the only admissions they have. We've talked about the re-exam admission, the AB admission, Judge Dike, and I raised the VIRMA admission. We talked a little bit about sunlight. They've got a problem with sunlight and the positions they took. Dr. Maniatis, one of the inventors, testified in the Lilly trial, not on deposition, as Ariadne says, but in the Lilly trial, and he said, well, sunlight induces NF-kappa B activity, but these methods in the patent, they're related to things inside the cell. They're not related to walking into the shade or putting up an umbrella. And they cited that in their opposition to JMAL as how one of ordinary skill in the art would understand the claims. They've got big problems right down the line. Dr. Ravitch in the Lilly case came back and talked about antibiotics and substances that bind to TNF-alpha, like Enbrel, talking about- I have a question. Why didn't you raise some sort of claim construction estoppel argument here? I mean, there was another Ariadne case involving other claims of the exact same patent with the identical term at issue, and Ariadne argued in that instance that the NF-kappa B activity in cells, which is the only relevant term here, wasn't limited. So, I guess, how come that's not a problem here for us? Because the claim construction in that case, Your Honor, was not, first of all, was not appealed to this court. I believe that was actually an agreed construction that Lilly and Ariadne entered into, and it related to the term reducing- But Ariadne agreed upon a construction in one case that is so broad as to possibly render it invalid as applied to these claims as well, certainly as applied to those. I don't know. Why didn't you hold their feet to the fire and make them live with it here? A couple points on that, Your Honor. First of all, I think this is the correct claim construction. As a matter of law, this is the right claim construction based on the claims. Well, the claim says reducing NF-kappa B activity in cells. Yes. Why doesn't that refer to reducing the activity that is occurring in the cell? Why does the actor that causes the reduction have to be inside the cell? I really don't understand that argument. Straight from the claim language, a couple of different reasons. First, NF-kappa B activity itself is intracellular. That is explicitly- Yes, but many extracellular actors can cause the reduction of the activity inside the cell. Embrel is one. Kinerect is another. Antibiotics are a third. Sunlight is yet another. There are an awful lot of actors that can reduce NF-kappa B activity in the cell without ever entering the cell themselves. First, just so it's not lost in the shuffle, I disagree on what does reduce NF-kappa B activity. You disagree on what? That it reduces NF-kappa B activity. You disagree that what reduces it? That Embrel reduces NF-kappa B activity. Do you disagree that Embrel reduces NF-kappa B activity? Yes. Embrel doesn't reduce inflammation? Embrel reduces inflammation. Isn't that the whole purpose of it? It's an anti-arthritis. Embrel reduces inflammation, but whether it reduces NF-kappa B activity is a different question. Isn't the reduction of NF-kappa B linked to the anti-inflammatory? NF-kappa B has a role in the inflammation process, but a lot of things do. TNF has a number of impacts, one of which, in certain circumstances, relates to NF-kappa B. Embrel binds to a TNF, which prevents it from then going into the TNFF receptor, and a necessary, it seems to me, result of that is a reduction in NF-kappa B. It may not have been your intent. Maybe that wasn't why you created Embrel, but I don't see how you're arguing it doesn't actually do that. I think in a strictly linear world, Your Honor, I see the logic, but this is biology, and these are complicated systems. There's a lot going on. A lot of different things can affect NF-kappa B, and removing TNF-alpha may or may not, at the end of the day, have an effect on NF-kappa B in this complicated cellular system. That's my only point on that. As to Kineret, they originally had asserted Kineret infringement, and they dropped their allegation, so I assume they couldn't establish an effect on NF-kappa B. We're dealing with summary judgment here, right? Yes. So your argument about Embrel and the fact that you say, just because it binds to TNF and prevents it from getting into a TNF receptor, and you're saying Embrel doesn't factually, as a matter of fact, work that way, that can't be the basis for the district court's summary judgment of non-infringement, because that sounds like a fact question. I didn't mean to spend a lot of time on that, Your Honor. I just didn't want a fact sitting out there or a suggestion that I agreed with a statement that is a disputed fact. For purposes of summary judgment here, the issue was, does Embrel go into the cell and do something, or doesn't it? And the answer is, it does not. And the claim construction, I believe correctly, requires that something that actually be taken directly inside the cell. That's the part I'm struggling with. Why? So NF-kappa B activity is an intracellular phenomenon. If you reduce NF-kappa B activity, you have necessarily reduced an intracellular phenomenon. Yes, but that reduction can take place through a number of methods that aren't inside the cell. They're walking me into the shade. For purposes of summary judgment, we have to assume Embrel reduces NF-kappa B, because it's a factual question. So we have to assume Embrel reduces NF-kappa B. You agree, Embrel doesn't go into the cell, right? That's correct. That's correct. But the claims require, because NF-kappa B activity is strictly intracellular, in the cells becomes superfluous if it relates to where the NF-kappa B activity is, because that's in the cells already. Therefore, in the cells has to relate to the action reducing. And I disagree with Mr. Chesler. We all the time say things where prepositional phrases are separated from an action word. We did this at the district court. I'll do it again. Cooking dinner in a microwave oven. The action word is cooking. The location is in a microwave oven, and it's separated by what's been acted on. It's exactly the same thing here. It's a grammatical error. People don't write patents using spruik and white, you know? I mean, neither side has anything going for it on the claim language as to whether in the cell includes ambrane or not. I mean, it just doesn't work. I don't think you can parse the words the way they want to parse the words using a spruik and white rule either, Your Honor. I think looking at the claim terms, though, and the agreed construction of NF-kappa B activity, in the cells becomes superfluous if it applies to NF-kappa B activity. In addition, the claims at issue here talk about intracellular signaling in the cells, reducing intracellular signaling in the cells. Where else is intracellular signaling but in the cells? It can't be anywhere else. Otherwise, it wouldn't be intracellular signaling. Are you suggesting patent lawyers are never redundant? They never redundantly say the same thing twice, Your Honor. But how can you reduce something if you don't have it? I'm fine with that. You need an existing NF-kappa B activity to reduce it. The issue, they've raised this discussion in connection with the inducing set of limitations and does there need to be prior induction before reduction. There needs to be existing NF-kappa B activity in order to show a reduction, and we show a couple pictures in our red brief of how if decoys were described and if decoys worked and if you could get a decoy into the cell, how it would be possible to put a decoy there before stimulating the cell and you'd still reduce NF-kappa B activity. So that's agreed. There needs to be an existing NF-kappa B activity. But that dispute deals with whether you have to have an inducer first and then wait and then add a reducer. And as we show in the red brief, in particular through that example, no, you don't have to do that. You can add a reducing agent first and then have NF-kappa B activity. But the claim says a method for diminishing induced NF-kappa B mediated blah, blah, blah. Are you saying that the preamble is not a limitation? Yes, Your Honor. We did say the preamble is not a limitation. We believe the preamble is redundant to the claim language in Claim 6. Well, if it's redundant, if your argument is that it's redundant, then you would say it's identically represented, so therefore you would say it does, the Claim 6 is limited to diminishing induced NF-kappa B. And for something to be induced is different from it just sitting there in the cell, right? Something occurring naturally in the cell is not being induced. Only something that is being triggered first is being induced. Okay. There are a couple of different issues there. NF-kappa B is in the cell naturally. It becomes active if it's induced. And the discussion and the claims relate to decreasing or reducing NF-kappa B activity in cells. So there must have been something that created this NF-kappa B activity. There must have been an induction. So that's why the last part of the claim includes the requirement that there be existing NF-kappa B activity that is reduced, but doesn't require the order that AREA wants to impose. And just to be clear, the reason they want to impose an order is for purposes of their reexamination. It doesn't really deal with the issues here. But the point is you can reduce NF-kappa B activity at some point from NF-kappa B, I-kappa B. The District Court has the claim construction for NF-kappa B activity, which was not appealed in this case, is that it has the ability of NF-kappa B to act as an intracellular messenger by dissociating from I-kappa B, translocating the nucleus, and binding to DNA and affecting transcription. So you can intervene in the cell in that series of events after there has been activation of NF-kappa B. So you can have NF-kappa B activity that's reduced, even though the reducer is there first. That's the whole point of that discussion. But the real crux is all of this is in the cell. The claim language says that there's nothing in the specification about extracellular anything being part of any pathway. And there's nothing in the claims about this pathway or this signal transduction pathway either. Mr. Chesler pointed to Column 3 in the patent, and that language he read from lines 59 to 62 of Column 3. Actually, the sentence continues on to 64. What that's talking about is doing something inside the cell to influence the effect of something outside the cell. That is maintaining. It isn't eliminating an inside-outside distinction. It maintains the inside-outside distinction. And the text continuing from the bottom of Column 3 under the top of Column 4 talks specifically about extracellular influences and the importance of extracellular influences. The patent talks about the first messenger-second messenger system, where the first messenger is outside, the second messenger is inside. And NF-kappa-B is likened to a second messenger, which is inside the cell and only inside the cell. And the intervention occurs inside the cell. That's what this discussion is about. That's what that patent's about. Lily was here in the—I'm sorry, Erin was here in the Lily argument. And their counsel talked about you don't—it's not about affecting the stimulus. It's about affecting the cell and doing something to the cell's response to the stimulus. That's what they described the methods about. And that's everywhere. It's in the claims. It's in the specification. It's throughout the reexamination, the Lily trial, and so on. That's the way they've characterized this, and there really is— there isn't a way to construe these claims to reach outside and capture something like Enbrel that just— it never even touches the cell. I've talked briefly about the prior induction issue, Your Honors. The key issue on the prior induction question is the order issue. What they want to do is they want to impose an order that there must be a reducer added before an inducer. And as I've explained, that doesn't hold water, and the red brief covers that. All right. Thank you. That's for two minutes. Thank you, Your Honors. Very quickly, point one, if Your Honors would look at the record at 1735, you will see in the record an article that explicitly talks about Enbrel, in fact, reducing NF-kappa B activity in cells. So respectfully, I would correct counsel's statement. Point two, I would like to come back to Judge Dyke's point about the reexam statement, and I want to make one other point about why I believe, Your Honor, our reading of it is correct. If Your Honor looks at the distinction that's drawn between A and B, A says reducing the induced NF-kappa B activity, etc. B says preventing the external inducing. And again, I said before and I meant it, the absence of further is critical here. The entire distinction between these two subparagraphs is reducing what has already been induced and preventing something that has never been induced. It was not ever intended to be, and I would submit it is not, in fact, a disclaimer of what we are contending is the proper claim construction here. It's drawing a distinction between no prior induction and, in fact, reducing what has previously been induced. Point three.  Yes, sir. It is true that all the embodiments shown, disclosed in the patent, reflect activity taking place inside the cell, right? I think specifically, I don't, Your Honor, I'm just not sure. I don't want to give an answer one way or the other and be inaccurate. There are numerous places where there are discussions about inhibiting external agents that are inducing factors, and I don't know whether you would include that or not as an example of activity taking place outside the cell. It is. These inducing factors only exist outside the cell. Next point with respect to the term in cells. Where the patent inventors wanted to explicitly talk about intervening in the pathway in a particular place, they did so. And I would ask the Court to look at claims 32, 34, and 35, where there are specific references to actually breaking the cycle or inhibiting the activity by intervening at a particular spot, in two instances in the cytoplasm and in one instance in the nucleus. There is no such limitation in claims 6 or 18. Hold on, though. But claim 6 says in the cell, the nucleus and the cytoplasm are subsets of that. So it's not through claim differentiation the case that 32 and the other claims you're pointing to must necessarily mean that claim 6 is much broader than in the cell. But, Your Honor, claim 6 does not say that the reduction, the activity has to take place in the cell. I understand that. And those claims do. That's my point. Those claims do talk about taking action in the cell. Those claims talk about turning off the light switch. They talk about taking action in a particular subset of the cell. Exactly. Turning off the light switch, which is not what 6 and 18 deal with. Just one other point. I would urge the court, in terms of this in-cell, outside point, to look at 1461 in the record. That's part of the prosecution history with respect to claim 18, which was previously numbered 175. And if Your Honors look at that piece of the prosecution history, you will see that the phrase intracellular activity gets changed to activity, and then there's some words, in the cells. It's perfectly clear that intracellular activity was a situation in which activity was being modified by intracellular, not reduction. And the patent office says that that was merely a formal language change. It says that later on in the prosecution history. So taking out the phrase intracellular activity and replacing it with activity in the cells is, I would submit, absolutely manifestly clear proof that the modification is for activity and not for reduction. And that's based on the prosecution history in addition to the construction of the language itself. I see that I'm over my time. All right. We'll take the appeal under advisement and thank the counselor. Thank you. All rise. Thank you.